IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11–cv–00581–WYD–KMT

WYATT T. HANDY JR.,

     Plaintiff,

v.

SGT. CUMMINGS, individual & official capacity,
DEP. WENDELBURG, individually,
DEP. THAO, individually,
DEP. LIGON, individually,
DEP. ELLEDGE, individually,
DEP. GIRARD, individual,
GRETCHEN SETTAMBRINGO, individual & official capacity,
TERRI WOOD, individual
MELINDA MOLLENDOR, individual,
DEP. LITWILER, individual & official capacity,
NANCY SIVAK, individual,
DEP. KRAUSE, individual,
DEP GALLEGOS, individual,
DEP. HUNT, individual,
SGT. CLARK, individual & official capacity,
SGT. DOIZAKI, individual & official capacity,
DEP. EMERSON, individual,
DEP KLEINHEKSEL, individual,
SHERIFF GRAYSON ROBINSON, individual & official capacity,
CAPT. SAUTER, individual & official capacity,
LT. WHITIKER, individual & official capacity,
SGT. RANKIN, individual & official capacity,
DEP. FREEMAN, individual,
DEP. LONGFELLOW, individual,
DEP. HAMM, individual,
LT. WICKSTROM, individual & official,
LT. VIENOT, individual & official,
DEP. TERRY, individual,
DEP. C JONES, individual,
COUNTY OF APARAHOE,

DEP. VIGIL, individual,
SGT. NORDI, individual & official,
APARAHOE COUNTY SHERIFF DEPARTMENT, and
DEP. VINCENT, individual,

       Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

**Magistrate Judge Kathleen M. Tafoya**

       This case comes before the court on the "Motion for Summary Judgment of All Defendants Except County of Arapahoe[1] to Plaintiff's Third Amended Complaint" (Doc. No. 136, filed March 29, 2012 [Mot.]).  For the following reasons, the court recommends that Defendants' Motion be GRANTED.

## FACTUAL BACKGROUND

       The following factual background is taken from Plaintiff's Third Amended Complaint (Doc. No. 119, filed Jan. 5, 2012 ["TAC"]), as well as the parties briefing with respect to this Recommendation.  In this case, Plaintiff, a pretrial detainee at the Arapahoe County Detention Facility (ACDF), asserts claims pursuant to 42 U.S.C. §§ 1983, 1985 & 1986; the Religious Land Use and Institutionalized Persons Act (RLUIPA); and state law.  As will be outlined below, Plaintiff alleges that Defendants, in both their official and individual capacities, violated his "rights to access to the court, freedom of speech, to petition the government to redress

_____

[1] The County of Arapahoe was dismissed as a defendant on September 26, 2012. (*See* Doc. No. 182.)

grievances, to self-representation, due process of law, to not be retaliated against, and to be free of punishment, as a pretrial detainee." (TAC at 13.)

On September 1, 2010, Plaintiff requested to be placed in administrative segregation for his own safety. (*Id.* at 22, ¶ 22.) More specifically, Plaintiff explained to ACDF staff that "somebody put a 'snitch' jacket on him" and that he was "attacked and had his head busted" on August 22, 2010. (*Id.*) That same day, Defendant Clark granted Plaintiff's request and Plaintiff was placed into administrative segregation. (*Id.*)

On October 25, 2010, Plaintiff got into a verbal confrontation with former defendant Deputy Morrison[2] regarding a pat-down search. (*Id.* at 13-14, ¶ 1.) Plaintiff maintains that during that search, Deputy Morrison "ran his hand hard twice between the Plaintiff's buttocks and brushed his anus." (*Id.*) Plaintiff complained to an unknown female sergeant and informed both Deputy Morrison and the sergeant that he would be filing a grievance relating to the "inappropriateness of the pat-search, and for sexual harassment." (*Id.*) After allegedly learning that other inmates were subjected to similar searches by Deputy Morrison, Plaintiff encouraged other inmates to protest and sign a grievance that Plaintiff had prepared. (*Id.*)

Plaintiff maintains that immediately after the incident involving Deputy Morrison, Defendants launched an eight-month "campaign of retaliation against the plaintiff for him filing grievances and engaging in constitutionally protected activity." (*Id.*) This alleged campaign began the following day, October 26, 2010, when Defendant Cummings started denying Plaintiff

---

[2] Deputy Morrison was dismissed as a defendant on December 21, 2011. (*See* Doc. No. 117.)

physical access to ACDF's law library, notwithstanding the fact that Plaintiff "was proceeding *pro se* in a criminal case and had prior authorization to attend the law library" from ACDF administration.  (*Id.*)

On October 27, 2010, after receiving Plaintiff's first grievance against Deputy Morrison regarding the pat search, Defendant Elledge allegedly "began hassling the plaintiff about the grievance, saying that inmates have no rights, and that Dep. Morrison has a right to conduct his pat-searches the way he pleases."  (*Id.* at 14-15, ¶ 3.)  Defendant Elledge then ordered Plaintiff to "return to his cell and lockdown," even though Plaintiff allegedly had "10 minutes remaining on his 1 hour of free time."  (*Id.*)  Plaintiff also maintains that the next day, October 28, 2010, Defendant Elledge did not let Plaintiff out of his cell for any free time.  (*Id.*)

On December 18, 2010, Plaintiff filed a grievance against Defendant Cummings for denying Plaintiff access to the law library.  (*Id.* at 15, ¶ 4.)  The following day, December 19, 2010, Defendant Cummings interviewed Plaintiff regarding this grievance.  (*Id.,* ¶ 15.)  Plaintiff alleges that Defendant Cummings told him that he would not be receiving any "special treatment" and that Plaintiff "should not be filing grievances against his deputies."  (*Id.*)  Plaintiff then ended the interview and informed Defendant Cummings that he was going to exhaust the grievance process and file a lawsuit against Defendant Cummings for violating his constitutional rights.  (*Id.*) Plaintiff maintains that Defendant Cummings then threatened Plaintiff with a "Captain's Segregation Housing Order," which, according to Plaintiff, is the "worst punishment in this facility."  (*Id.*)  Plaintiff submitted another grievance against Defendant Cummings relating to this interview.  (*Id.*)

4

On January 10, 2011, Plaintiff maintains that he submitted the "third & final step grievance against Sgt. Cummings for threats, retaliation, and the denial of his access to the courts." (*Id.* at 16, ¶ 6.) The following day, January 11, 2011, a team of 7-10 deputies, all of whom were directly supervised by Defendant Cummings, came to Plaintiff's cell during linen exchange to conduct a search. (*Id.*, ¶ 17.) Plaintiff maintains that, while the other 4-7 deputies remained with him outside of his cell, Defendants Ligon, Thao, and Girard searched Plaintiff's cell and "began throwing away his personal items, including (35) pencils, (3) erasers, & (2) highlighters." (*Id.*) Plaintiff also asserts that these defendants gave him clothes "4 sizes to [sic] small and would not exchange them." (*Id.*) Plaintiff filed a grievance relating to this incident on January 11, 2011. (*Id.* at 17.)

On January 21, 2011, Plaintiff filed a third & final step grievance against Defendant Elledge asserting that Defendant Elledge retaliated against Plaintiff on January 13, 2011 by confiscating old "money release forms" that Plaintiff had intended to use as evidence in this case. (*Id.* at 17, ¶ 8; Ex. G.) Plaintiff maintains that the following day, January 22, 2011, Defendant Elledge again ordered Plaintiff to lock-down ten minutes prior to his free time ending. (*Id.* at 17, ¶ 9.)

On January 30, 2011, Plaintiff maintains that he gave Defendant Litwiler legal mail to send out and deliver to the mailroom. (*Id.* at 23, ¶ 28; *see also* Ex. Z.) Attached to that request was 1 stamped envelope addressed to this court. (*Id.*) However, several days later, Defendant Wood responded that the envelope was no longer attached to the kite request that was given to

Defendant Litwiler.  (*Id.*)  Plaintiff filed a grievance related to this incident on February 8, 2011. (*Id.*, at 23, ¶ 29.)

On February 1, 2011, Plaintiff submitted to Defendant Sauter a third and final step grievance against Defendant Ligon, Thao, Girard, and Cummings regarding the January 11, 2011 search of his cell.  (*Id.* at 17-18, ¶ 10.)  Plaintiff alleges that Defendant Sauter either never received or never responded to any of Plaintiff's appeals or grievances.  (*Id.*)

On February 8, 2011, Defendants Girard and Wendelburg, under the supervision of Defendant Cummings, allegedly entered into Plaintiff's cell and disposed of a highlighter that Plaintiff used for his legal work.  (*Id.* at 18, ¶ 11.)  Plaintiff filed a grievance against Defendant Cummings related to this incident on February 14, 2012.  (*Id.* at 18-19, ¶ 12.)

Plaintiff maintains that, on February 12, 2011, Defendant Mollendor rejected mail directed to Plaintiff from his family.  (*Id.* at 23, ¶ 30.)

On February 15, 2012, Defendant Cummings allegedly came to Plaintiff's cell and told Plaintiff that if "plaintiff filed a lawsuit against him for retaliation, he would file a counterclaim against [] plaintiff."  (*Id.* at 19, ¶ 13.)  Plaintiff filed a grievance related to this incident on February 25, 2011.  (*Id.*)

Plaintiff maintains that, on March 1, 2011, Defendant Doizaki threatened Plaintiff with physical violence in the presence of Defendants Elledge and Kleinheksel.  (*Id.* at 26, ¶ 43.)

On March 2, 2011, Plaintiff's administrative segregation housing order was terminated and Defendant Litwiler informed Plaintiff that he was being moved to housing unit 6-E.  (*Id.*) Plaintiff informed Defendant Litwiler that he had enemies in Pod 6 and in the jail, and that he

6

wanted to stay in administrative segregation for his safety.  (*Id.*)  Defendant Litwiler allegedly

gave Plaintiff an ultimatum—either move to the general population, or be written up and moved

to "punitive segregation."  (*Id.*)  When Plaintiff refused to move, Defendant Litwiler wrote him

up.  (*Id.*)  That same day, Plaintiff submitted a kite to "classifications" stating that he wanted to

remain in administrative segregation for "his safety and due to enemies."  (*Id.* at 20, ¶ 16.)

On March 15, 2011, a disciplinary hearing was held, at which Plaintiff was found

guilty—ostensibly for refusing to move out of administrative segregation—and was given the

maximum sanction of 13 days in lock-down.  (*Id.,* ¶ 17.)  The disciplinary hearing board was

made up of Defendants Kraus, Gallegos, and Hunt.  (*Id.*)  Plaintiff filed an appeal of the

disciplinary board's findings on March 21, 2012.  (*Id.* at 20-21, ¶ 18.)  That appeal was denied

by Defendant Clark on April 1, 2011, even though Defendant Clark "knew plaintiff cannot be

housed in the general population without serious problems" because Defendant Clark initially

authorized Plaintiff's placement in administrative segregation.  (*Id.* at 21-22, ¶¶ 20, 24.)

Relatedly, on March 21, 2011, Plaintiff filed a grievance against Defendant Sivak and

"other staff members" for retaliation.  (*Id.* at 21, ¶ 19.)  Plaintiff maintains that, even though he

was written up and immediately placed in administrative segregation on March 2, 2011, he did

not receive credit toward his 13 day lock-down sanction for the time that he spent in

administrative segregation prior to his March 15, 2011 hearing.  (*Id.*)

On April 4, 2011, Defendant Litwiler told Plaintiff that he was again being moved to the

general population.  (*Id.* at 23-24, ¶ 31.)  Plaintiff again expressed concern for his safety and

suggested that he would either get hurt or in trouble if he was transferred to the general

population. (*Id.*)  In an report authorized by Defendant Rankin, Defendant Litwiler wrote

Plaintiff up for refusing to move. (*Id.* at 24, ¶¶ 31-32.)  Defendant Whitiker placed Plaintiff in

administrative segregation pending his disciplinary hearing. (*Id.,* ¶ 33.)  On April 7, 2011,

Plaintiff was found guilty at his disciplinary hearing and given "21 days in the hole." (*Id.,* ¶ 35.)

On April 12, 2011, Defendants Girard, Longfellow, and Hamm allegedly entered into

Plaintiff's cell and threw his highlighter and food into the trash. (*Id.,* ¶ 36.)

On April 25, 2011, Chief Judge Wiley Y. Daniel entered an Order Granting Service by

United States Marshal. (*See id.* at 25, ¶ 37; *see also* Doc. No. 27.)  Plaintiff alleges that on April

27, 2012, the day that he and Defendants allegedly received copies of Judge Daniel's Order

Granting Service by United States Marshal, Defendant Doizaki ordered Defendants Elledge and

Kleinheksel to "forcefully move" Plaintiff into a cell with "Inmate Swiney." (*Id.,* ¶ 38.)

Plaintiff alleges that Inmate Swiney weighs 350 pounds and "was placed on [Administrative

Segregation] for being a bully, intimidater [sic], & a sexual preditor [sic]." (*Id.*)  Plaintiff filed a

grievances against Defendants Sivak and Doizaki on April 27 and 28, 2011, respectively,

regarding this incident. (*Id.*)  One day later, on April 28, 2011, Inmate Swiney was moved out of

the cell he shared with Plaintiff. (*Id.*)

On April 29, 2011, Defendants Kleinheksel and Emerson transported Plaintiff to

disciplinary segregation from administrative segregation. (*Id.* at 25-26, ¶ 39.)  Defendant

Kleinheksel informed Plaintiff that they had to take Plaintiff's legal work, which consisted of

two small boxes. (*Id.*)  Defendant Kleinheksel asked Plaintiff if there was any legal work that

Plaintiff was not using, and Plaintiff allegedly informed Defendant Kleinheksel that "all of his

legal work is current, and that he needed all of his legal work." (*Id.*) Defendants Kleinheksel and Emerson nevertheless "forcefully took the plaintiff's box of legal work, including case laws and documents related to this case against the defendants, claiming that the new rule was inmates are only allowed one (1) box of legal documents in disciplinary segregation." (*Id.*) Plaintiff maintains that there is "no such rule . . . in the inmate rule book"; that three weeks prior to this incident, Plaintiff "was allowed all his legal documents" while in disciplinary segregation; and that "there's currently other inmates in disciplinary segregation who have more then [sic] one (1) box of legal documents." (*Id.*) Plaintiff maintains that due to the confiscation of his legal documents, he was "unable to provide a short 'Memorandum of Law' in support of his Order to Show Cause for a Preliminary Injunction & a Temporary Restraining Order, nor respond to any answers or motions to dismiss that the defendants will file in this case." (*Id.*)

On May 17, 2011, "a day after several defendants was [sic] served with copies of the summons and complaint in this case," Plaintiff was allegedly written up by Defendant Terry for throwing food at the 4A pod door and for using abusive language. (*Id.* at 26-27, ¶ 44.)

On May 20, 2011, Defendants Doizaki and Wickstrom ordered that Plaintiff be moved to general population, "notwithstanding his safety concerns." (*Id.* at 27, ¶ 47) Plaintiff again refused to be housed in the general population and was instead placed into a "cold cell with no blankets or anything for hours." (*Id.* at 27-28, ¶ 48.) The following day, May 21, 2011, Defendant Doizaki "authorized that the plaintiff be charged with various infractions" for Plaintiff's refusal to move to the general population. (*Id.* at 28, ¶ 49.)

On May 24, 2011, Plaintiff was found guilty of the "charges" relating to throwing his food at Defendant Terry. (*Id.,* ¶ 51.) As a consequence, Plaintiff was placed on lock-down for 48 days. (*Id.*) On May 25, 2011, Plaintiff was escorted to disciplinary segregation by Defendants Emerson and Kleinheksel even though there was "a waiting list of inmates, who had been on the list for weeks waiting to go." (*Id.,* ¶ 52.) Defendants Emerson and Kleinheksel allegedly confiscated one of Plaintiff's boxes of legal work and his religious materials. (*Id.,* ¶ 53.) Plaintiff maintains that he should have been permitted to have these materials in disciplinary segregation and that other inmates were allowed such materials in disciplinary segregation. (*Id.*) Plaintiff further asserts that he sent numerous requests and grievances for the return of his legal work and religious materials to Defendants Doizaki, Wickstrom, and Sauter, but that each of those requests was denied. (*Id.* at 29, ¶ 54.)

On June 9, 2011, Plaintiff was allegedly "pat-searched" by Defendant Jones. (*Id.*) Plaintiff maintains that Defendant Jones "inappropriately touched [his] scrotum and ran his hand between the plaintiff's butt cheeks." (*Id.,* ¶ 55.) Over a month later, Defendant Vigil subjected Plaintiff to a similar pat search. (*Id.* at 31, ¶ 68.) Plaintiff maintains that Defendant Nordi "is approving of this conduct." (*Id.*)

Plaintiff maintains that, on June 17, 2011, he received discovery in Case Number 11-cv-708-WYD-KMT from the Adams County District Attorney's Office. (*Id.* at 29, ¶ 56.) Plaintiff alleges that although Defendants placed these materials in Plaintiff's property, he was not permitted to review them, despite several requests to Defendant Doizaki. (*Id.,* ¶ 57.)

10

On June 28, 2011, Plaintiff put in a kite to make a legal phone call to the "Arapahoe County Civil Court . . . to inquire why he was not writted [sic] to his 6-22-11 trial, and the status of his case." (*Id.* at 31, ¶ 67.)  Defendant Litwiler denied this request and then "forwarded his denial to Defendant Whitaker, who approved the denial." (*Id.*)  Defendant Emerson also denied Plaintiff the opportunity to make a legal telephone call to the Adams County District Court on July 27, 2011. (*Id.,* ¶ 69.)

On July 29, 2011, Plaintiff allegedly discovered that the prayer book that Defendants Kleinheksel and Emerson confiscated from him on May 25, 2011, was missing from his property. (*Id.* at 32, ¶ 71.)  The following day, at Defendant Doizaki's authorization, Defendant Swan wrote Plaintiff up for a "false misconduct report" based on his failure to lock down when directed to by Defendant Swan. (*Id.* ¶ 70; *see also id.* Ex. ZZ.)

Finally, Plaintiff's complains of ACDF's legal mail policy.  More specifically, Plaintiff alleges that prior to December 1, 2010, ACDF mailroom policy permitted indigent inmates to receive four white and four manila envelopes per request for sending legal mail. (*Id.* at 22-23, ¶ 25.)  However, on December 1, 2010, Defendant Settambrino allegedly modified the policy so that inmates could only receive one white and one manila envelope per request. (*Id.*)  Plaintiff filed a grievance relating to this policy on December 30, 2010. (*Id.* at 23, ¶ 26.)

## PROCEDURAL HISTORY

Plaintiff's initial Complaint was filed on March 8, 2011. (Doc. No. 1.)  After his complaint was amended on two prior occasions (*see* Doc. Nos. 29, 73), Plaintiff's Third Amended Complaint, now the operative pleading, was filed on January 5, 2012 pursuant to the

court's order granting in part and denying in part Plaintiff's Motion to Amend the Complaint. (*See* Order, Doc. No. 118.)

Defendants filed their Motion for Summary Judgment on March 28, 2012.  (*See* Mot.) Plaintiff filed his "Response to Defendants [sic] Motion for Summary Judgment" (Doc. No. 149 [Resp.]) on April 20, 2012, and the "Reply in Support of Motion for Summary Judgment of all Defendants except County of Arapahoe to Plaintiff's Third Amended Complaint" (Doc. No. 150 [Reply]) was filed on May 4, 2012.  Accordingly, this matter is ripe for the court's review and recommendation.

## LEGAL STANDARDS

### A.       *Summary Judgment Standard*

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c).  A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the evidence is such that it might

lead a reasonable jury to return a verdict for the nonmoving party.  *Thomas v. Metropolitan Life Ins.*

*Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible

evidence.  *See Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010).  The factual

record and reasonable inferences therefrom are viewed in the light most favorable to the party

opposing summary judgment.  *Concrete Works*, 36 F.3d at 1517.  Moreover, because Plaintiff is

proceeding *pro se*, the court, "review[s] his pleadings and other papers liberally and hold[s] them

to a less stringent standard than those drafted by attorneys."  *Trackwell v. United States*, 472 F.3d

1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520-21

(1972) (holding allegations of a *pro se* complaint "to less stringent standards than formal pleadings

drafted by lawyers").  At the summary judgment stage of litigation, a plaintiff's version of the facts

must find support in the record.  *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the

record, so that no reasonable jury could believe it, a court should not adopt that version of the facts

for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380

(2007); *Thomson*, 584 F.3d at 1312.

Finally, because Plaintiff submitted his Third Amended Complaint under penalty of

perjury (*see* TAC at 55), the court may treat that pleading as an affidavit.  *Green v. Branson,* 108

F.3d 1296, 1301 n.1 (10th Cir. 1997).  *See also Conaway v. Smith*, 853 F.2d 789, 792 (10th

Cir.1988) ("Although a nonmoving party may not rely merely on the unsupported or conclusory

allegations contained in his pleadings, a verified complaint may be treated as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56(e).”). “Rule 56(e) requires that the affidavit be based on personal knowledge, contain facts which would be admissible at trial, and show that the affiant is competent to testify on the matters stated therein.” *Conaway*, 853 F.2d at 792.

Where the court treats a verified complaint as an affidavit, whether a party’s affidavit in opposition to summary judgment is “sufficient to create a genuine issue of material fact must be evaluated in light of the principle that ‘conclusory allegations without specific supporting facts have no probative value.’” *Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir. 1990) (quoting *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)). *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 884 (1990) (quoting Fed. R. Civ. P. 56(e)) (“When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party’s pleading”)). The court must determine whether Plaintiff has come forward with specific facts to overcome Defendants’ Motion for Summary Judgment.

### B.    *Qualified Immunity*

The doctrine of qualified immunity shields government officials from individual liability for civil damages “insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is “an immunity from suit rather than a mere

defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 121 (2001).

Because of the underlying purposes of qualified immunity, courts address qualified immunity questions differently from other summary judgment decisions. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, who must meet a "heavy two-part burden." *Id.* Plaintiff first must establish that the facts, taken in the light most favorable to Plaintiff, show that the officer's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201. If Plaintiff establishes a violation of a constitutional or statutory right, "the next, sequential step is to ask whether the right was clearly established." *Id.* This determination must be made "in light of the specific context of the case, not as a broad general proposition." *Id.* "The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. If the plaintiff fails to satisfy either part of this "heavy two-part burden," the court must grant the defendant qualified immunity and dismiss the deficient claims.

The United States Supreme Court has altered somewhat the analytical process outlined in *Saucier*, holding that the sequence of the analysis is no longer mandatory. *Pearson v. Callahan*, 555 U.S. 223 (2009). The judges of the district courts and the courts of appeals are now permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at

hand. *Id.* at 236.  The Supreme Court noted, however, that the sequence set forth in *Saucier*

often is the appropriate analytical sequence. *Id.*

## ANALYSIS

In their Motion for Summary Judgment, Defendants move for summary judgment on all

of Plaintiff's claims.  The court addresses Defendants' arguments with respect to each of

Plaintiff's claims in turn below.[3]

### A.      *Voluntary Dismissals*

As a threshold matter, the court notes that Plaintiff requests that Defendants Settambrino,

Mollendor, and Wood be dismissed from this suit.  (Resp. at 25, 30.)  Plaintiff also has "no

objection" to Claims Ten, Thirteen, and Fourteen being dismissed.  (*Id.* at 36, 38.)  Defendants

consent to the dismissal of these claims and defendants.  (Reply at 1.)  Accordingly, the court

recommends that Claims Ten, Thirteen, and Fourteen, and Defendants Settambrino, Mollendor,

and Wood be dismissed.

### B.      *Claims One and Three – Retaliation*

Plaintiff's Claim Three alleges that Defendants violated his First Amendment rights by

"level[ing] a campaign of harassment and retaliation against the plaintiff, for him filing

---

[3] The court does not, however, address Defendants' argument that a number of Plaintiff's allegations must be dismissed for failure to timely exhaust administrative remedies.  (Mot. at 40-41.)  The court elects this course of action because (1) contrary to Defendants' position (*see id.* at 41), a finding that the plaintiff did not properly exhaust administrative remedies would result in merely a dismissal without prejudice*, see, e.g., Snyder v. Harris,* 406 F. App'x 313, 317 (10th Cir. 2011), and (2) exhaustion is an affirmative defense, not a jurisdictional requirement, *Jones v. Bock,* 549 U.S. 199, 212-16 (2007).

grievances and lawsuits, for the purpose of chilling and punishing him for engaging in federally protected activity." (TAC at 34, ¶ 83.) Similarly, although designated by Plaintiff as "42 U.S.C. § 1983 First Amendment – Freedom of Speech" (*id.* at 33), the substance of Plaintiff's Claim One asserts the exact same allegations as Plaintiff's Claim Three (*see id.*, ¶¶ 75–77).

Access to courts is a fundamental right protected by the Constitution, including the First Amendment right to petition the government for redress of grievances. *Nordgren v. Milliken*, 762 F.2d 851, 853 (10th Cir. 1985). "[P]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his right of access to the courts." *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990). This principle extends to an inmate's filing of an administrative grievances because, pursuant to 42 U.S.C. § 1997e, he must first file a grievance in order to ultimately gain access to courts to state a claim for relief. *See id.*; *Wildberger v. Bracknell*, 869 F.2d 1467, 1468 (11th Cir. 1989) (holding that retaliation for filing lawsuits and administrative grievances "violates both the inmate's right of access to the courts and the inmate's First Amendment rights"). Furthermore, a plaintiff's claim that he has been retaliated against for the exercise of a constitutionally protected right is actionable under § 1983 "even where the action taken in retaliation would be otherwise permissible." *Smith,* 899 F.2d at 948.

However, "it is not the role of the federal judiciary to scrutinize and interfere with the daily operations of a state prison." *Peterson v. Shanks,* 149 F.3d 1140, 1144 (10th Cir. 1998). "[A]n inmate is not inoculated from the normal conditions of confinement experienced by convicted felons serving time in prisons merely because he has engaged in protected activity." *Id.* That is, not "every response to a prisoner's exercise of a constitutional right gives rise to a

retaliation claim." *Dawes v. Walker*, 239 F.3d 489, 492-93 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). "[I]n order to establish a First Amendment retaliation claim, a prisoner must demonstrate that he was (1) engaged in protected conduct; (2) that he suffered an adverse action; and (3) that a causal connection exists between the protected conduct and the adverse action." *Baldauf v. Hyatt*, 10-cv-01315-REB-CBS, 2008 WL 280839 at *7 (D. Colo. 2008) (unpublished decision) (citing *Scott v. Churchill*, 377 F.3d 565, 569 (6th Cir. 2004)).

Defendants argue in large part that Plaintiff cannot satisfy the third element of a retaliation claim.  (Mot. at 25-26.)  Under this element, an inmate must set forth "*specific facts* showing retaliation because of the exercise of [his] constitutional rights"—i.e., the plaintiff "must prove that 'but for' the retaliatory motive, the incidents to which he refers . . . would not have taken place." *Peterson*, 149 F.3d at 1144 (citations omitted, emphasis in original).  This causal connection may be shown through circumstantial evidence, such as temporal proximity, a chronology of events, or suspicious timing.  *See Smith*, 899 F.2d at 949.

In this case, Plaintiff has attached to his Third Amended Complaint alone over 50 grievances that he filed between October 26, 2010 and August 14, 2012.  Under these circumstances, temporal proximity between an inmate's exercise of his right of access to the courts and some form of jailhouse discipline alone is insufficient to establish a causal connection.  *Friedman v. Kennard,* 248 F. App'x 918, 922 (10th Cir. 2007).  Indeed, the probative value of a temporal connection is especially limited where "a plaintiff has undertaken a plethora of grievances and lawsuits." *Brown v. Sales,* 134 F.3d 382, 1998 WL 42527, at *3 (10th

Cir. Feb. 4, 1998) (unpublished table opinion).  If temporal proximity alone were sufficient under these circumstances, "litigious prisoners could claim retaliation over every perceived slight and resist summary judgment simply by pointing to their litigiousness."  *Strope v. Cummings,* 381 F. App'x 878, 883 (10th Cir. 2010).  Altogether, to survive summary judgment, a plaintiff must demonstrate "not only that a retaliatory motive may have played some role in [the challenged conduct] but that such a motive was the strict but-for cause of [the conduct]."  *Id.* (citing *Peterson,* 149 F.3d at 1144).

### 1.    *Denial of Physical Law Library Access*

The first episode of alleged retaliation occurred on October 26, 2010, when Defendant Cummings denied Plaintiff the opportunity to attend the law library.  (TAC at 14, ¶ 2.)  Plaintiff maintains that Defendant Cummings did so in order to retaliate against Plaintiff for filing a grievance against Deputy Morrison for the October 25, 2010 pat search.  (*Id.*)  Defendants argue that Plaintiff cannot establish that Defendant Cummings's actions would not have occurred but for a retaliatory motive.  (Mot. at 19.)  The court agrees with Defendants.

Defendant Cummings made the decision to deny Plaintiff physical[4] access only one day after Plaintiff grieved Deputy Morrison; however, as established above, temporal proximity alone is insufficient to satisfy the strict but-for causation requirement applicable to Plaintiff's retaliation claims.  *Friedman,* 248 F. App'x at 922.  Otherwise, Defendant Cummings has

---

[4] The court notes that Plaintiff was only denied an opportunity to <u>physically</u> attend the law library.  It appears that Plaintiff was provided "access" to the law library via a "book mobile service."  (*See* Resp. at 3, 21; *see also* Mot., Ex. A-2, Affidavit of Michael Cummings, ¶ 5 [Cummings Aff.].)

19

averred that he did not learn of the October 25, 2010 pat search involving Deputy Morrison until March 2011—approximately five months after he denied Plaintiff access to the law library. (Cummings Aff., ¶ 7.)  This evidence suggests that Defendant Cummings's decision to deny Plaintiff law library access was not motivated by Plaintiff's grievance against Deputy Morrison. As noted below, Defendant Cummings's testimony is the only <u>competent</u> evidence on this topic.

Plaintiff has not introduced any evidence that creates a genuine dispute of material fact as to whether Defendant Cummings knew that Plaintiff had grieved Deputy Morrison when he deprived Plaintiff of physical access to the law library—much less that the grievance was the but-for cause of Defendant Cummings's actions.  Although Plaintiff maintains that Defendant Cummings "was briefed on the morning of October 26, 2010," regarding the pat-search incident involving Deputy Morrison (Resp., Ex. 1-A, Declaration of Wyatt Handy, ¶ 6 [Handy Decl.]), Plaintiff has failed to proffer any evidence establishing that he could conceivably have personal knowledge of this purported briefing. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters.")  Similarly, Plaintiff has not submitted any evidence to support his speculative position that an "accusation this serious would've been documented, and every supervisor would've been briefed or debriefed on the incident."  (Resp. at 3, ¶ 8.)

Therefore, because Plaintiff has failed to establish a genuine dispute of material fact as to whether Defendant Cummings knew that Plaintiff had grieved Deputy Morrison regarding the October 25, 2010 pat search when he denied Plaintiff access to the law library, the court finds

that Plaintiff has failed to establish the but-for causation element of his retaliation claim with respect to these allegations.  Accordingly, the court finds that finds that Plaintiff has failed to establish that Defendant Cummings retaliated against him by denying him physical access to the law library.

### 2.      *Lock Down Orders*

The next episode of alleged retaliation occurred on October 27, 2010, when, after receiving Plaintiff's grievance against Deputy Morrison, Defendant Elledge ordered Plaintiff to return to his cell and lock down, even though Plaintiff allegedly had 10 minutes remaining on his one hour of free time.  (TAC at 13-14, ¶ 3.)  Plaintiff also alleges that the following day, October 28, 2010, Defendant Elledge took away Plaintiff's entire one hour of free time for the same reason.  (*Id.*)  Finally, Plaintiff alleges that on January 22, 2011, the day after Plaintiff filed a grievance against Defendant Elledge for confiscating old "money release forms," Defendant Elledge again retaliated against Plaintiff by ordering Plaintiff to lock down ten minutes before his free time actually ended.  (*Id.* ¶ 9.)

The court finds that Plaintiff has failed to establish that his grievances against Deputy Morrison and Defendant Elledge were the but-for cause of Defendant Elledge's lock-down orders.  Although Defendant Elledge took the above actions shortly after Plaintiff filed grievances against him and Deputy Morrison, the court reiterates that temporal proximity alone is insufficient to satisfy the causation element of a retaliation claim in this case because, due to the sheer volume of grievances, any temporal proximity is meaningless.  *Friedman,* 248 F. App'x at 922.  Otherwise, Defendant Elledge has submitted sworn testimony that, although he

21

indeed ordered and escorted Plaintiff to lock-down on October 27, 2010 and January 22, 2011,

he did so at the direction of the Detention Operations Technician (D.O.T.) tasked with

"keep[ing] track of the time elapsed for each individual inmate during an inmate's hour out."

(Mot., Ex. A-4, Affidavit of Kirk Elledge, ¶ 5 [Elledge Aff.].)  More specifically, on both

occasions, Defendant Elledge escorted Plaintiff into his cell only after Plaintiff had refused to

comply with the D.O.T.'s order to "lockdown."  (*Id.* ¶¶ 5, 7.)

Plaintiff does not dispute that Defendant Elledge ordered Plaintiff to lockdown at the

behest of the D.O.T.  (*See* Handy Decl. ¶¶ 8-10; Resp. at 4-5, ¶ 14.)  As a consequence, the court

finds that the ten-minute time differential amounts merely to a disagreement between Plaintiff's

and the D.O.T.'s calculation of Plaintiff's remaining free time.  Further, although Plaintiff

maintains that Defendant Elledge began "hassling" and "yelling" at him upon receiving the

grievance relating to Deputy Morrison's October 25, 2010 pat search (Handy Decl. ¶ 8; *see also*

TAC at 14, ¶ 3), these averments fall short of constituting "*specific facts* showing retaliation

because of the exercise of [his] constitutional rights."  *Peterson,* 149 F.3d at 1144 (emphasis

added).

To the extent that Defendant Elledge took away Plaintiff's entire hour of free time on

October 28, 2010, Defendants have submitted evidence demonstrating that Plaintiff was "written

up and placed on 'shift lockdown'" that same day for "disorderly conduct after repeatedly calling

Defendant Emerson a 'bitch.'"  (Elledge Aff. ¶ 6, Attach. 1; Mot., Ex. A-5, Affidavit of Logan

Emerson [Emerson Aff.], ¶ 6, Attach. 1; *see also* TAC, Ex. B-2.)  Although Plaintiff disputes

that he called Defendant Emerson a "bitch," and thus maintains that he was placed on shift

lockdown for "false reasons," he does not dispute that his hour of free time was taken from him because he was on shift lockdown.  (Resp. at 2; Handy Decl. ¶ 9.)  Plaintiff has not submitted any evidence to support his conclusory position that he was placed on shift lockdown "for filing the grievance against dep. Morrison."  (Handy Decl. ¶ 9.)

Altogether, Plaintiff has failed to establish a genuine issue of material that Defendant Elledge's lock-down orders on October 27 and 28, 2010, and January 22, 2011 were causally connected to the exercise of his constitutional rights.  Indeed, to find a causal connection based on these scant facts would amount to unwarranted interference by the federal judiciary in the daily operations of ACDF.  *Peterson*, 149 F.3d at 1140.  Accordingly, the court finds Plaintiff has failed to establish a retaliation claim based on Defendant Elledge's lock-down orders.

### 3.     *Cell Searches*

Plaintiff maintains that on January 11, 2011—one day after he submitted a grievance against Defendant Cummings for denying Plaintiff access to the law library (*see* TAC, Ex. E)—a team of 7-10 deputies came to Plaintiff's cell to conduct a search (*id.* at 16-17, ¶ 7).  Plaintiff maintains that these defendants retaliated against him for filing a grievance against Defendant Cummings by giving Plaintiff clothes that were four sizes too small and by throwing away his pencils, erasers, and highlighters.  (*id.* at 16, 17, ¶ 7.)  Finally, Plaintiff alleges that during subsequent cell searches occurring on February 8, 2011 and April 12, 2011, Defendants Cummings, Girard, Longfellow, and Hamm threw away other highlighters in Plaintiff's possession.  (*Id.* ¶¶ 11, 36.)

23

At the outset, the court notes that periodic cell searches are an integral and regular component of prison life and that inmates have no right to privacy with respect to cell searches. *Hudson v. Palmer,* 468 U.S. 517, 526, 529-30 (1984) (random cell searches are "perhaps the most effective weapon of the prison administrator in the constant fight against the proliferation of knives and guns, illicit drugs, and other contraband."). Thus, the mere fact that Plaintiff was the target of cell searches along is insufficient to establish the adverse action necessary to establish a § 1983 retaliation claim.

Similarly, the court finds that the fact that a team of 7-10 deputies gathered outside Plaintiff's cell on January 11, 2011, is insufficient, on its own, to satisfy the second, or "adverse action," element of a retaliation claim. That factor contemplates action that results in the chilling of the inmate's exercise of his constitutional rights. *See Parker v. Zavaras,* No. 08–cv–00737–MSK– KLM, 2011 WL 1211487, at *14 (D.Colo. Mar. 31, 2011) ("[T]hreats are actionable in a § 1983 claim, if they are sufficient to chill a person of reasonable firmness."); *Rogers v. Garcia,* No. 08–cv–02821–WYD–MJW, 2010 WL 3547432, at *4 (D. Colo. Sept. 3, 2010) ("[r]etaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights.") (citation and internal quotation omitted)). Although Plaintiff may have been "nervous and felt intimated" (Handy Decl. ¶ 11), the court finds that the mere fact that a number deputies gathered outside of his cell is insufficient to chill a person of reasonable firmness—particularly when Plaintiff concedes that only three deputies actually entered his cell.

The fact that Defendants Ligon, Thao, and Girard may have thrown away a portion of Plaintiff's pencils and erasers also fail to establish this second element. Regardless of their justification for doing so, Plaintiff does not dispute that he was left with several working pencils. (*Compare* Mot. at 6, ¶ 22 *with* Resp. at 5, ¶ 22.) Indeed, it is clear that Plaintiff was not deterred from exercising his constitutional rights as the record demonstrates that Plaintiff filed a grievance regarding this incident that <u>very same day</u>. (*See* TAC, Ex. F.) Accordingly, the fact that Defendants Ligon, Thao, and Girard disposed of some, but not all, of Plaintiff's pencils and erasers as contraband fails to establish the second element of a § 1983 retaliation claim. *See also Escobar v. Holditch,* 06-cv-01222-CMA-KLM, 2010 WL 5230874, at *5-6 (D. Colo. Dec. 6, 2010) (rejecting a retaliation claim where it was clear from the record that the plaintiff continued to file numerous grievances against the defendants).

As to the remaining allegations regarding these cell searches, the court finds that Plaintiff has failed to satisfy the third element of a § 1983 retaliation claim—that is, he has failed to proffer specific facts demonstrating that the exercise of his constitutional rights was the but-for cause of Defendants' actions. Plaintiff once again primarily relies on the fact that Defendants' searched his cell shortly after he filed a grievance against Defendant Cummings, which, at the risk of redundancy, is insufficient in this case to satisfy the causation element of a retaliation claim. *Friedman,* 248 F. App'x at 922.

Otherwise, to the extent that Plaintiff was given clothes that were four sizes too small on January 11, 2011, Plaintiff concedes that inmate clothes are laundered, packaged, and labeled by inmate trustees, and that inmate clothes are not always labeled correctly. (Mot. at 6, ¶ 20: Resp.

25

at 5, ¶ 20.)  Plaintiff further admits that, during laundry exchange, it is the inmate trustees, and

not ACDF staff members, who provide laundered clothes to the inmate whose cell is being

searched.  (*Id.*)  Consequently, the incorrect sizing of Plaintiff's clothes was, at worst, the result

of an inmate's mistake and not the result of any retaliatory motive of Defendants Ligon, Thao,

and Girard.  *Strope,* 381 F. App'x at 883 (an isolated mistake is insufficient to establish a

retaliation claim).

      To the extent that Plaintiff's highlighters were thrown away on January 11, 2011,

February 8, 2012, and April 12, 2011, the record demonstrates that his highlighting markers

constituted contraband under ACDF policy.  More specifically, Plaintiff admits that items not

issued by ACDF or purchased by that particular inmate through the ACDF commissary are

contraband.  (Mot. at 6, ¶ 18; Resp. at 5, ¶ 18.)  Plaintiff further admits that highlighters are not

issued by ACDF (Mot. at 5, ¶ 17; Resp. at 5, ¶ 17) and that he did not purchase any of his

highlighters from the commissary (Mot. at 6, ¶ 19; Resp. at 5, ¶ 19).  Therefore, in light of these

undisputed facts, Plaintiff's highlighters were properly disposed of as contraband.  Plaintiff has

not proffered any specific facts showing that the decision to dispose of contraband items was

nevertheless the result of a retaliatory animus towards him.

      Altogether, for the reasons stated above, the court finds that Defendants' actions taken

while searching Plaintiff's cell on January 11, February 8, and April 12, 2011, were either not

"adverse actions" sufficient to chill a person of reasonable firmness from exercising their

protected rights, or not causally connected to Plaintiff's filing of grievances.  Therefore, even

when viewed in a light most favorable to Plaintiff, the court finds these facts to be insufficient to establish a § 1983 retaliation claim.

### 4.    *Confiscation of Money Release Forms*

Plaintiff maintains that, on January 21, 2011, Defendant Elledge retaliated against him by confiscating old money release forms that he intended to use as evidence in this case.  (TAC ¶ 8.) Again, the court finds that Plaintiff has failed to establish a causal connection between Defendant Elledge's actions and the exercise of Plaintiff's constitutional rights.   More specifically, Defendants admit that Defendants Elledge and Mollendor removed the old money release forms from Plaintiff's cell; however Plaintiff does not dispute that they were removed only because the forms had been revised and therefore were to be replaced.  (Mot. at 7, ¶ 26; Resp. at 6, ¶ 26.)  Moreover, upon learning that Plaintiff wanted to use the confiscated form as evidence in this case, Defendant Wood provided him with a copy of the outdated form. (Mot., Ex. A-37, Affidavit of Terri Wood, ¶ 7 [Wood Aff.].)  Although this likely did not satisfy Plaintiff because he wanted to use the *exact* form that was confiscated from him for his records (*see* Resp. at 6-7, ¶ 27), the fact that Defendant Wood took corrective measures belies any suggestion that Defendant Elledge acted with a retaliatory motive.  Instead, at best, it suggests that Defendant Elledge's confiscation of this "used" form was a mistake, which is insufficient to establish a retaliation claim.  *Strope,* 381 F. App'x at 883.  Most importantly, Plaintiff has not set forth any evidence to support his conclusory assertion that "[t]his incident would never had [sic] happened 'but for' retaliatory motive."  (*See* Resp. at 6-7, ¶ 27; *see also* Handy Decl. ¶ 15; TAC

¶ 8.)  Accordingly, the court finds that Defendant Elledge's confiscation of an old money form fails to establish a § 1983 retaliation claim.

### 5.   *Threats of Violence, Counterclaims, and Discipline*

Plaintiff alleges that, on a number of occasions, several defendants threatened Plaintiff with various repercussions for filing grievances.  First, on December 19, 2010, Plaintiff alleges that Defendant Cummings told Plaintiff that he would not be receiving any "special treatment," that he "should not be filing grievances against his deputies," and that he would place Plaintiff on a "Captain's Segregation Order" after Plaintiff suggested that he was going to file a lawsuit for violation of his constitutional rights.  (TAC at 15, ¶ 5.)  Defendant Cummings denies that he threatened Plaintiff on this occasion.  (Cummings Aff., ¶ 8.)

The court first finds that, even if true, Defendant Cummings's mere admonishment regarding filing grievances against his deputies is insufficient to deter a person of reasonable firmness from exercising their constitutional rights.  *Parker,* 2011 WL 1211487, at *14. Otherwise, the court finds that Plaintiff's own admissions belie any suggestion that Defendant Cummings's other threats were made to retaliate against Plaintiff's for exercising his constitutional rights.  More specifically, in the grievance Plaintiff filed regarding this incident, Plaintiff acknowledged that Defendant Cummings did not deny him "special treatment" because he filed grievances; instead, Defendant Cummings denied Plaintiff "special treatment" to the extent that Plaintiff sought physical access to the law library inconsistent with his placement in administrative segregation.  (TAC, Ex. D; *see also* Cummings Aff., ¶ 8.)  Similarly, while Defendant Cummings may have threatened Plaintiff with a "Captain's Segregation Order," he

28

did not do so because Plaintiff was filing grievances, but instead because Plaintiff had been submitting kites threatening other inmates.  (TAC, Ex. D; *see also* Cummings Aff. ¶ 8.)  Plaintiff has not submitted any evidence, other than his personal belief, that the true justification for these actions was to retaliate against Plaintiff for filing grievances.  (*See* Resp. at 22.)  Accordingly, the court finds that Plaintiff has failed to demonstrate that his filing of grievances was the but-for cause of these threats.

Second, Plaintiff maintains that, on February 15, 2011, Defendant Cummings came to Plaintiff's cell and threatened Plaintiff that he would file a counterclaim against Plaintiff if Plaintiff were to file a lawsuit against him for retaliation.  (TAC at 19, ¶ 13.)  Both Defendant Cummings and Defendant Girard deny that Defendant Cummings made any such threat, rendering this a disputed fact.  (Cummings Aff. ¶ 15; Mot., Ex. A-10, Affidavit of Jessica Girard, ¶ 9 [Girard Aff.].)  However, even assuming that this threat occurred, the court finds that it falls short of satisfying the second element of a § 1983 retaliation claim.  Specifically, the court finds that a reasonable person would not be deterred from exercising their constitutional rights by a defendant's speculative threat that he will file an unspecified counterclaim in an inmate's yet-to-be-filed lawsuit.  *Cf. Robinson v. Dean Foods Co.,* 08-cv-01186-REB-CBS, 2009 WL 2382764, at *4-5 (D. Colo. July 30, 2009) (finding that a counterclaim actually filed by an employer in an employment lawsuit was insufficient to chill the employee's pursuit of a discrimination claim).

Finally, although Plaintiff alleges that Defendant Emerson "has threatened the plaintiff with physical violence" on October 27, 2010" and that "Sgt. Doizaki, in the presence of defendants [] Elledge and Kleinheksel, threatened the plaintiff with physical violence" on

29

February 25, 2011[5] (TAC at 26, ¶¶ 42-43), these allegations are plainly conclusory insofar as

they do not elaborate whatsoever on the nature or substance of the alleged threats.  As such, they

have no probative value for purposes of summary judgment.  *Conaway,* 853 F.2d at 793 (reliance

on a verified complaint is insufficient to defeat summary judgment where the allegations

contained in the pleading are conclusory); *Celotex*, 477 U.S. at 324 (the nonmoving party must

designate "specific facts showing that there is a genuine issue for trial.") Further, both Defendant

Emerson and Defendant Doizaki deny making any such threats.  (Doizaki Aff. ¶ 7; Emerson Aff.

¶ 5.)  Plaintiff has not submitted any other evidence creating a genuine dispute of material fact as

to whether these alleged threats actually occurred.  As such, the court finds that Plaintiff has

failed to establish specific facts demonstrating that he was threatened with violence in retaliation

for the exercise of his constitutional rights.  *Peterson,* 149 F.3d at 1144.

Altogether, for the reasons outlined above, Plaintiff has failed to establish that the threats

discussed above either (1) actually occurred, (2) were sufficient to chill a person of reasonable

firmness from exercising his constitutional rights, or (3) were causally connected to Plaintiff's

exercise of his constitutional rights.  Therefore, the court finds that Plaintiff has failed to

establish that he was threatened in retaliation for exercising his constitutionally protected rights.

---

[5] Although Plaintiff alleges in the body of his Third Amended Complaint that Defendant
Doizaki threatened him with violence on March 1, 2011, it appears that the alleged incident
actually occurred on February 25, 2011.  (*Compare* TAC ¶ 43 *with id.,* Ex. LL.)  Plaintiff's
grievance regarding this incident was submitted on March 1, 2012.  (*Id.,* Ex. LL.)

**6.     Actions Relating to Placement in Administrative Segregation**

Plaintiff alleges that various defendants took a number of actions relating to Plaintiff's placement in administrative segregation in order to retaliate against him for filing grievances. These incidents include (1) the termination of Plaintiff's administrative segregation housing order on March 2, 2011 (TAC at 19, ¶ 13); (2) Defendant Litwiler's March 2, 2011 decision to write Plaintiff up for refusing to move to the general population that same day (*id.*); (3) a March 15, 2011 disciplinary hearing at which Plaintiff was found "guilty" of a disciplinary violation for refusing to move to the general population and sanctioned with 13 days in lockdown in the disciplinary housing unit (*id.* at 20,  ¶ 17); (4) Defendant Clark's denial of Plaintiff's appeal regarding his disciplinary conviction (*id.* at 21, ¶ 20); (5) Defendant Litwiler's April 4, 2011 decision to write Plaintiff up again for refusing to move to the general population (*id.* at 23, ¶ 31); (6) an April 7, 2012 disciplinary hearing at which Plaintiff was found "guilty" of his second refusal to move to the general population and sanctioned with 21 days in "the hole" (*id.* at 24, ¶ 35); and (7) Defendant Wickstrom and Doizaki's May 20, 2011 order that Plaintiff return to the general population.  (*id.* at 27, ¶ 47.)

At the outset, the court finds that the termination of Plaintiff's administrative segregation order on March 2, 2011 could not have been in retaliation for Plaintiff's grievance filings because the record demonstrates that the order authorizing his placement in administrative segregation was terminated at <u>Plaintiff's request</u>.  More specifically, the administrative segregation order was originally entered at Plaintiff's request in September 2010 after Plaintiff was apparently attacked in his cell.  (TAC at 22, ¶ 23.)  On March 1, 2011, however, Plaintiff

filed a kite requesting that he be removed from administrative segregation.  (*id.*, Ex. LL.)

Accordingly, pursuant to this request, Plaintiff's administrative segregation order was terminated

on March 2, 2011.  (*See id.* at 19, ¶ 15).  As such, all competent evidence in the record is

absolutely contrary to Plaintiff's position that Defendants terminated Plaintiff's administrative

segregation order as a retaliatory measure.

Otherwise, although Defendants concede that the remaining actions were taken, they

deny that they were taken to retaliate against Plaintiff for the  exercise of his constitutional

rights.  More specifically, Defendant Litwiler has averred that he wrote Plaintiff up on March 2,

2011 for a rule violation, not in order to retaliate against Plaintiff, but instead because Plaintiff

refused to move to the new housing assignment he requested and also refused to identify his

enemies in general population whom he felt necessitated his continued confinement in

administrative segregation.  (Mot., Ex. A-18, Affidavit of Lewis Litwiler, ¶ 6 [Litwiler Aff.].)

Similarly, Plaintiff was found guilty of this rule violation at the March 15, 2011 disciplinary

hearing, and his appeal of the same was denied, because Plaintiff again failed to substantiate his

claims that he had enemies in the jail that necessitated his continued confinement in

administrative segregation.  (Mot., Ex. A-9, Affidavit of Stephan Gallegos, ¶¶ 5, 6, 9 [Gallegos

Aff.]; Ex. A-16, Affidavit of Melanie Kraus, ¶¶ 5, 6, 9 [Kraus Aff.]; Ex. A-12, Affidavit of

Kimberlynn Hunt [Hunt Aff.] ¶¶ 5-7.)

Defendants have also submitted sworn testimony from Defendant Litwiler that he wrote

Plaintiff up for a rule violation on April 4, 2011 because Plaintiff had completed his time in

disciplinary segregation, but again refused to move to the general population.  (Litwiler Aff. ¶ 7.)

The Disciplinary Board presiding over Plaintiff's April 7, 2011 disciplinary hearing again found that the rule violation was supported because, although Plaintiff maintained that his ex-wife had put a "snitch jacket" on him, he was unable to identify who his purported enemies were. (Gallegos Aff. ¶¶ 7-9; Kraus Aff. ¶¶ 7-9; Mot, Ex. A-8, Affidavit of Karl Freeman, ¶¶ 5-6 [Freeman Aff.].)

Finally, Defendants Doizaki has averred that he and Defendant Wickstrom ordered Plaintiff to return to the general population because Plaintiff had finished serving his time in disciplinary segregation and his cell was being reassigned as a general population cell.  (Doizaki Aff. ¶ 7; *see also* Elledge Aff. ¶ 10.)  Plaintiff then refused to allow his new cellmate to enter the cell by moving his body into the cell doorway.  (*Id.*)  Accordingly, Plaintiff was written up for a two disciplinary violations.  (*Id.*)

Other than the fact that the March 2, 2011 termination of Plaintiff's administrative segregation housing assignment was completed six days after Plaintiff filed a grievance against Defendant Cummings, Plaintiff has not introduced any evidence to support his conclusory assertions that these actions "were all done in retaliation for the plaintiff filing grievances against Defendant Litwiler and the other defendants."  (Resp. at 24.)  Although Plaintiff insists that he did inform Defendants who his enemies were and that they were otherwise well-aware of his safety concerns (*see* Handy Decl. ¶ 20; Resp. at 9-10, ¶¶ 34-35, 39), Plaintiff has not proffered any specific facts, outside of his personal opinion and legal conclusions, that these incidents "would not have happened 'but for' the retaliatory motive." (Resp. at 10, ¶ 35; *see also id.* at 9-11, ¶¶ 34-41.)  Therefore, because temporal proximity alone is insufficient to satisfy the strict

33

but-for causation element of a retaliation claim—particularly where, as here, the defendants have amply set forth the penological justifications for their actions—the court finds that Defendants' actions relating to Plaintiff's assignment to administrative segregation fail to establish a § 1983 claim for retaliation.

### 7.   *Failure to Credit with Administrative Segregation Time*

Plaintiff alleges that Defendant Sivak[6] failed to properly credit him with the time he spent in administrative segregation prior to his March 15, 2011 hearing.  (TAC at 21, ¶ 19.)  Plaintiff maintains that under ACDF policy, inmates who are placed on administrative segregation pending the outcome of a disciplinary matter, "will have the credit for the administrative segregation time, applied to the disciplinary detention time, at a ratio of two (2) admin. seg. days to (1) disciplinary detention day." (*Id.*)

Defendants assert first that Defendant Sivak properly calculated Plaintiff's disciplinary time.  More specifically, effective June 1, 2009, Defendant Sauter ordered that "any disciplinary sanction being served will be credited at a "day to day" rather than a "two for one" rate.  (Mot., Ex. A-26, Affidavit of Nancy Sivak, ¶ 5, Attach. 1.)

Plaintiff disputes that ACDF policy was so revised, and asserts that, on April 21, 2010, he was provided with an inmate handbook stating that credit for administrative segregation time is applied to disciplinary detention time at a ratio of two administrative segregation days to one

---

[6] In their Motion, Defendants erroneously assert that Plaintiff alleges that Defendant *Woods* failed to properly credit his "time served." (Mot. at 23.)  However, Plaintiff's Third Amended Complaint refers to "Nancy." (TAC ¶ 19.)  Because Defendant Woods' first name is "Terri," the court finds that these allegations instead refer to Defendant *Nancy* Sivak.

disciplinary detention day.  (Resp. at 12, ¶ 43 (citing TAC, Ex. S.)) However, even if there was

some ambiguity as to the proper policy or whether the time was accurately calculated, what is

clear is that Defendant Sivak was acting pursuant to an existing order from the ACDF Captain,

and not to retaliate against Plaintiff.  Indeed, Plaintiff has not proffered any evidence to support

his position that he "did not receive (2 to 1) days . . . in retaliation for him filing grievances and

lawsuits." (Resp. at 11-12, ¶ 43; *see also* TAC ¶ 19.)  Therefore, even assuming Plaintiff is

correct that Defendant Sivak failed to provide him with the proper credit for his time in

administrative segregation, Plaintiff has not shown that the exercise of his constitutional rights

was the strict but-for cause of Defendant Sivak's actions.  As such, the court finds that Plaintiff

has failed to establish a § 1983 retaliation claim based on this incident.

### 8.    *Purposeful Loss of Envelope*

Plaintiff appears to assert that, on January 30, 2011, Defendant Litwiler retaliated against

him by tampering with or purposefully losing the envelope attached to a kite requesting that a

certified copy of his account balance be forwarded to this court.  (TAC at 23, ¶¶ 28-29; Ex. Z-

AA.)  However, other than the coincidental fact that the envelope was allegedly lost "seven days

after the plaintiff submitted a step 1 grievance against Deputy Elledge," (Resp. at 25), Plaintiff

has not submitted any evidence suggesting that Defendant Litwiler actually lost or tampered with

Plaintiff's envelope at all (*see id.* at 25-26)—let alone that he did so in order to retaliate against

Plaintiff.  In fact, to the contrary, Defendant Litwiler maintains that he does not remember

receiving a kite with an envelope attached to it.  (Litwiler Aff. ¶ 46.)  Moreover, the evidence

shows that a certified copy of Plaintiff's account statement was, in any event, sent out on

February 7, 2011, and Plaintiff was provided a copy of the same.  (TAC, Ex. AA; Mot., Ex. A-25, Affidavit of Gretchen Settambrino, ¶ 7 [Settambrino Aff.].)  Altogether, at very worst, it appears that the "purposeful" loss of Plaintiff's envelope, which notably did not injure Plaintiff in any way, was a mistake.  Because an isolated mistake is insufficient to establish a § 1983 retaliation claim, the court finds that Plaintiff has failed to establish that Defendant Litwiler retaliated against him for filing grievance by losing his envelope.

### 9.      Confiscation of Legal Work and Religious Materials

Plaintiff maintains that, on April 29 and May 25, 2011, Defendants Kleinheksel and Emerson retaliated against him for filing grievances and a lawsuit by confiscating boxes containing Plaintiff's legal work and religious materials.  (TAC at 25-26, ¶¶ 39; *id.* at 28, ¶ 53.)  The court finds that these actions are insufficient to constitute an "adverse action." *Worrell v. Henry,* 219 F.3d 1197, 1212 (10th Cir. 2007).

More specifically, although Plaintiff disputes that ACDF policy provides that inmates in disciplinary segregation are allowed only one "tub" of property at a time in their cell, he does not dispute that inmates can request access to any additional property in order to rotate the items kept in their cells.  (*See* Mot. at 13, ¶ 48; Resp. 13, ¶ 48.)  Further, Plaintiff does not dispute that he was instructed to decide what property he would place in each tub or that he did not care which of the two tubs remained in his cell.  (*See* Mot. at 13, ¶¶ 50-51; Resp. at 13-14, ¶ 15-51.)  In light of these undisputed facts, the court finds that a person of reasonable firmness would not be deterred from filing future grievances and lawsuits simply because they did not have twenty-four hour access to all of their personal property—even where that property may include legal

36

and religious materials.  Indeed, to hold otherwise would plainly contradict the Tenth Circuit's

guidance that "an inmate is not inoculated from the normal conditions of confinement," as well

as its admonishment that "it is not the role of the federal judiciary to scrutinize and interfere with

the daily operations of a state prison."  *Peterson,* 149 F.3d at 1144.  Therefore, the court finds

that Plaintiff has failed to establish a § 1983 claim for retaliation based on Defendants

Kleinheksel and Emerson's removal and separate storage of his legal work and religious

materials.

### 10.     *May 17, 2011 Write Up*

Plaintiff asserts that, on May 17, 2011, Defendant Terry wrote him up for a "bogus

charge" in order to retaliate against him for filing grievances and lawsuits.  (TAC at 27, ¶¶ 45-

46.)  The court again finds that Plaintiff has failed to establish that he would not have been

written up but-for his filing of grievances and lawsuits.  Plaintiff primarily argues that he "should

have never been charged with such a serious offense, when nothing hazardous such as bodily

fluids were thrown, nor was Defendant Terry, staff, or other persons around."  (Resp. at 15, ¶ 53)

As previously noted, Plaintiff was written up for throwing food at the 4A pod door and for using

abusive language.  (TAC at 26-27, ¶ 44.)  Although Plaintiff contests the magnitude of his

actions, he does not dispute that he threw food and used abusive language.  Even setting aside

the fact that the ACDF Disciplinary Board found that the rule violations were supported (*see,

e.g.*, Mot., Ex. A-32, Affidavit of Collin Vincent, ¶¶ 5-6 [Vincent Aff.]), the mere fact that

Plaintiff does not believe that he should have been written up for his actions does little to

37

establish that Defendant Terry acted in order to retaliate against Plaintiff for exercising his constitutional rights.

To the extent that Plaintiff argues that the write up incident occurred one day after the summons and initial complaint in this case was served (Resp. at 15, ¶ 53), Plaintiff has not submitted any evidence demonstrating that Defendant Terry actually knew that service had been effected.  Even then, as discussed above, temporal proximity alone is insufficient to satisfy the third element of Plaintiff's retaliation claim.  *Friedman,* 248 F. App'x at 922.  Accordingly, the court finds that Plaintiff's claim that Defendant Terry wrote him for a "bogus charge" fails to establish a § 1983 retaliation claim.

### 11.    *Denial of Legal Telephone Calls*

Plaintiff maintains that, on June 28, 2011, Defendants Litwiler and Whitaker retaliated against him by denying his request to make a legal phone call to the Arapahoe County Civil Court to inquire "why he was not writted [sic] to his 6-22-11 trial and the status of the case." (TAC at 31, ¶ 67.)  Again the court finds that Plaintiff has failed to establish that Defendants Litwiler and Whitaker denied his request for a legal phone call in order to retaliate against him for exercising his constitutional rights.  More specifically, Defendant Whitaker has submitted sworn testimony stating that he was informed by the Arapahoe County court that Plaintiff was represented by legal counsel and, therefore, was required to address the court through his attorney.  (Mot., Ex. A-35, Affidavit of Robert Whitaker, ¶ 5 [Whitaker Aff.].)  Although Plaintiff maintains that he was proceeding *pro se* in the case at issue, and he does not dispute that Defendant Whitaker was so advised by the Arapahoe County court.  (Resp. at 16, ¶ 61.)

38

Under these circumstances, at very best, the denial of Plaintiff's legal phone call was the result of a mistake over whether Plaintiff was indeed proceeding *pro se*, which, as already discussed, is insufficient to establish a § 1983 retaliation claim. *Strope,* 381 F. App'x at 883. Indeed, Plaintiff has not submitted any evidence to support his conclusory assertion that "'but for' the retaliatory motive, [he] would've been allow to make legal phone calls in his *pro se* cases, like other inmates." (Resp. at 16, ¶ 61.) Plaintiff has not cited to any portion of the record to substantiate his position that other inmates were allowed to make legal phone calls on demand in their *pro se* cases or that he was in any way harmed by being denied the requested phone call. *See* Fed. R. Civ. P. 56(c)(1). As such, the court finds that Plaintiff has failed to establish specific facts showing retaliation because of the exercise of his constitutional rights. *Peterson,* 149 F.3d at 1144.

### 12. *July 30, 2011 "False" Report*

Plaintiff maintains that, on July 30, 2011, Defendant Swan wrote Plaintiff up for a false misconduct report. (TAC at 32, ¶ 70.) The court finds that Plaintiff has failed to establish that Defendants Swan acted with a retaliatory motive. More specifically, Defendants assert that, although Defendant Swan was working overtime in the Detention Facility on this occasion, he normally worked in court services, and therefore "did not know who Plaintiff was or that he had filed grievances and lawsuits." (Mot., Ex. A-27, Affidavit of Craig Swan, ¶¶ 4, 6. [Swan Aff.].) Although Plaintiff maintains that Defendant Swan knew of Plaintiff and that he had filed grievances and lawsuits because "whenever Plaintiff went to court the court service deputies would talk to the plaintiff about the issue," (Resp. at 17, ¶ 65), this does not establish that

Defendant Swan <u>himself</u> was familiar with Plaintiff.  More importantly, even assuming

Defendant Swan was aware of Plaintiff, the court finds that Plaintiff has failed to proffer any

evidence suggesting that Defendant Swan wrote him up in order to retaliate against him for filing

grievances and lawsuits.  (*See* TAC, at 32, ¶ 70; Resp. at 17, ¶¶ 64-66; Handy Decl. ¶¶ 35-39.)

In fact, it is not clear what, if any, constitutionally protected activity allegedly precipitated

Defendant Swan's actions.  As such, the court finds that Plaintiff has failed to demonstrate that

Defendant Swan wrote him up in order to retaliate against him for exercising his protected rights.

### 13.    *Placement with a Dangerous Inmate*

Finally, Plaintiff asserts that, on April 27, 2012, Defendants Doizaki ordered Defendants

Elledge and Kleinheksel to move a dangerous inmate into Plaintiff's cell, despite the fact that

Plaintiff was in administrative segregation because of safety concerns.  (TAC at 25, ¶ 38.)  The

court finds that Plaintiff has failed to establish that the purportedly dangerous inmate was

transferred into Plaintiff's cell to retaliate against Plaintiff for filing grievances and lawsuits.

Again, Plaintiff has failed to proffer any evidence supporting his conclusory assertion that

Defendants Doizaki, Elledge, and Kleinheksel "would not have moved the Plaintiff in the cell

with [the dangerous inmate] 'but for' a retaliatory motive."  (Resp. at 18, ¶ 70; *see also* TAC at

25, ¶ 38.)  In fact, to the contrary, Plaintiff does not dispute that ACDF staff was in the process

of consolidating all inmates into one location—which required that inmates be double-

bunked—and that Plaintiff and the purportedly dangerous inmate were placed into one cell

because they were previously housed next to each other.  (Mot. at 16, ¶ 69; Resp. at 18, ¶ 69; *see*

*also* Mot., Ex. A-24, Affidavit of Vince Sauter, Attach. 1 [Sauter Aff.].)  Furthermore, Plaintiff

does not dispute that the purportedly dangerous inmate was returned to the general population only one day after he was placed in the same cell as Plaintiff (Sivak Aff. ¶ 10.) Accordingly, the court finds that Plaintiff has failed to establish that Defendants Doizaki, Elledge, and Kleinheksel's decision to transfer a purportedly dangerous inmate into Plaintiff's cell fails to establish a § 1983 retaliation claim.

In summary, the court finds that, even when the facts are viewed in a light most favorable to him, Plaintiff has failed to establish a § 1983 claim for retaliation for the exercise of his constitutional rights.[7] As to each of the above incidents, even when considered cumulatively, the court finds that Plaintiff has failed to establish that either (1) he was engaged in constitutionally protected activity, (2) that Defendants' actions were sufficient to chill a person of ordinary firmness from continuing to engage in that activity, or (3) that Defendants' adverse actions were based on Plaintiff's exercise of his constitutional rights. *Worrell*, 219 F.3d at 1212. In addition, to the extent that any of the remaining defendants were not discussed in this section, Plaintiff has failed to establish that those defendants personally participated in any allegedly retaliatory conduct. *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation."). As such, because Plaintiff has failed to establish that Defendants infringed upon his constitutional right to

---

[7] Plaintiff's Third Amended Complaint also alleged that Defendants Settembrino and Mollendor, retaliated against Plaintiff by refusing to provide him with one white and one manila envelope for every indigent mail request. (TAC at 22-23, ¶¶ 25-27.) As discussed above, pursuant to Plaintiff's request, the court has recommended that Defendants Settembrino and Mollendor be dismissed as defendants from this suit. Therefore, the court has not addressed these allegations.

be free from retaliation, Defendants are entitled to qualified immunity as to Plaintiff's Claims

One and Three. *Harlow*, 457 U.S. at 818. Accordingly, the court finds that Defendants' Motion

for Summary Judgment is properly granted as to Plaintiff's Claims One and Three.

### C.      Claims Two and Seven – Access to the Courts

As a threshold matter, the court finds that Claim Two, which alleges that Defendants

violated his First Amendment right to petition the government for grievances, and Claim Seven,

which alleges that Defendants violated his Fourteenth Amendment right of access to the court,

are identical. *See Nordgren v. Milliken,* 762 F.2d 851, 853 (10th Cir. 1985) (prisoner's

constitutional right of access to the courts is accorded by Article 4 of the Constitution and the

Fourteenth Amendment, as well as by the First Amendment right to petition).

The court also notes that Plaintiff's Third Amended Complaint does not clearly specify

what conduct allegedly violated his rights of access to the courts and to petition the government

for grievances. (*See* TAC ¶¶ 78-80, 98-100.) Defendants have assumed that Plaintiff challenges

(1) Defendant Litwiler's alleged purposeful loss of the envelope attached to Plaintiff's kite

request to mail a certified copy of his account statement (*id.* ¶¶ 28-29); (2) Defendant Litwiler's

and Emerson's denial of legal phone calls on June 28 and July 27, 2011, respectively (*id.* ¶¶ 67-

69-29); (3) Defendant Cummings's denial of law library access (*id.* ¶¶ 2, 4-6); and (4) Defendant

Elledge's confiscation of the old money release form (*id.* ¶ 8).[8] (Mot. at 28.) In his Response,

---

[8] Defendants have also construed Plaintiff's Third Amended Complaint to assert a claim that Defendant Mollendor and Settembrino's actions of providing only one white and one manila envelope per request violated his right of access to the court. (*See* Mot. Summ. J. at 28; *see also* TAC ¶¶ 25-27.) However, the court has already recommended that these Defendants be

Plaintiff also maintains that Defendants Doizaki, Emerson and Kleinheksel violated his right of access to the courts by confiscating the box of Plaintiff's legal materials.  (Resp. at 32.) Liberally construing Plaintiff's Third Amended Complaint, the court finds that Claim Two and Seven indeed intended to challenge these incidents.

Prison inmates have a constitutional right to meaningful access to the courts.  *Bounds*, 430 U.S. at 823.  That right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."  *Id.* at 828.  "Conversely, prison officials may not affirmatively hinder a prisoner's efforts to construct a nonfrivolous appeal or claim." *Green v. Johnson*, 977 F.2d 1383, 1389 (10th Cir. 1992). "Any deliberate impediment to access [to the courts], even a delay of access, may constitute a constitutional deprivation."  *Id.* (internal quotation marks and citation omitted).

However, to establish a violation of his right of access to the courts, a plaintiff must prove that he was actually impeded in his ability to conduct a particular case.  *See Lewis v. Casey,* 518 U .S. 343, 348–55 (1996).  In order to satisfy the actual injury requirement, the plaintiff must show that prison officials frustrated or impeded the plaintiff's ability to file non-frivolous direct appeals from his conviction, a habeas corpus petition, or a civil rights claim pursuant to § 1983 "to vindicate basic constitutional rights."  *Id.* at 351, 354–55 (internal quotation marks and citation omitted).  *See also Peterson*, 149 F.3d at 1145 ("To present a viable

---

dismissed pursuant to Plaintiff's request.  Accordingly, the court does not address whether Plaintiff's intended to challenge these actions through Claim Two and Seven.

claim for denial of access to courts, however, an inmate must allege and prove prejudice arising from the defendants' actions.").

The court finds that Plaintiff has failed to establish a claim for violations of his constitutional rights of access to the court and to petition the government for grievances. Plaintiff has not argued, let alone submitted any evidence demonstrating, that the purportedly loss of his envelope, the denial of legal phone calls, and the confiscation of an old money release form caused him any actual injury. (*See* at Resp. 30-33.)

Similarly, Plaintiff's unsupported assertion that Defendant Cummings's denial of physical law library access prevented him from preparing "his anticipated motions" for an unspecified November 24, 2010 motions hearing fails to establish any actual injury. (*Id.* at 32.) Plaintiff has not submitted any evidence regarding the content of these unspecified motions, the court that held this motions hearing, or how he was injured.

Finally, in light of this court's recommended disposition of Defendants' present motion , the court finds that Plaintiff did not suffer any injury as a result of Defendant Doizaki, Emerson and Kleinheksel's "confiscation" of a tub of his legal material.  More specifically, Plaintiff maintains that these actions prevented him from adequately preparing the "Memorandum of Law" submitted in this case on May 5, 2011 seeking a temporary restraining order and/or preliminary injunction.  (*See* Doc. No. 32.)  However, to obtain an temporary restraining order or preliminary injunction, Plaintiff would have had to show, among other things, a "substantial likelihood of success on the merits."  *Kikumura v. Hurley,* 242 F.3d 950, 955 (10th Cir. 2001). Because the court concludes in this Recommendation that Plaintiff has not established any

violations of his constitutional or statutory rights, Plaintiff necessarily could not have demonstrated a strong likelihood of success on the merits in order to obtain a temporary restraining order or preliminary injunction.  Therefore, even assuming that Defendants Doizaki, Emerson, and Kleinheksel impeded Plaintiff's access to the courts by "confiscating" his legal materials, Plaintiff cannot show that their actions resulted in an actual injury.

Altogether, the court finds that Plaintiff has failed to establish a claim that any of the above actions violated his constitutional right of access to the court and to petition the government for grievances.  Consistent with this conclusion, the court finds that these defendants are entitled to qualified immunity from Claims Two and Seven.  Therefore, the court finds that Defendants' Motion for Summary Judgment is properly granted as to Plaintiff's Claims Two and Seven.

### D.      Claims Four and Five – Free Exercise and RLUIPA

Plaintiff's Claim Four and Claim Five allege that Defendants Robinson, Sauter, Wickstrom, Doizaki, Kleinheksel, and Emerson violated Plaintiff's First Amendment free exercise and RLUIPA rights, respectively.  (TAC at 35-36,  ¶¶ 84-93.)  More specifically, Plaintiff maintains that these defendants violated his free exercise rights and RLUIPA by confiscating, refusing to return, and then losing his Islamic prayer book and prayer schedule. (*Id. at 28-29,* ¶¶ 53-54; *id.* at 32, ¶ 71.)

### 1.      Individual Liability under RLUIPA

As a threshold matter, the court finds that Plaintiff's RLUIPA claim, Claim Five, improperly names Defendants Robinson, Sauter, Wickstrom, Doizaki, Kleinheksel and Emerson

in their individual capacities. RLUIPA permits cases against a government entity, not an

individual official—except perhaps in his or her official capacity. *Boles v. Neet,* 402 F. Supp. 2d

1237, 1240 (D. Colo. 2005); *see also* 42 U.S.C. 2000cc-2(a) (a person may assert a violation of

RLUIPA "in a judicial proceeding and obtain appropriate relief against a *government*.")

(emphasis added). Therefore, as a matter of law, Plaintiff cannot establish a RLUIPA claim

against these defendants in their individual capacities.

### 2.   *Personal Participation of Defendants Robinson, Sauter, and Wickstrom*

The court agrees with Defendants that Plaintiff has failed to establish that Defendants

Robinson, Sauter, Wickstrom, and Doizaki personally participated in any violation of his First

Amendment rights. "Individual liability under § 1983 must be based on personal involvement in

the alleged constitutional violation." *Foote*, 118 F.3d at 1423. To establish personal liability, a

plaintiff must show that the official caused the deprivation of a federal right. *Kentucky v.

Graham*, 473 U.S. 159, 166 (1985). There must be an affirmative link between the alleged

constitutional violation and each defendant's participation, control or direction, or failure to

supervise. *See Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993). In other words,

"for liability to arise under § 1983, a defendant's direct personal responsibility for the claimed

deprivation of a constitutional right must be established." *Trujillo v. Williams*, 465 F.3d 1210,

1227 (10th Cir. 2006).

Claims Four alleges that Defendants Robinson, Sauter, Wickstrom, and Doizaki violated

Plaintiff's First Amendment rights by denying his numerous kites and grievances for the return

of the Islamic prayer book and prayer schedules confiscated by Defendants Kleinheksel and

46

Emerson.  (TAC at 35, ¶¶ 86; *see also id* ¶ 54.)  At best, however, the record reflects that

Defendant Doizaki denied a single kite from Plaintiff requesting the return of his religious

materials.  (TAC, Ex. SS.)  In any event, it is well established that the "denial of a grievance, by

itself without any connection to the violation of constitutional rights alleged by plaintiff, does

not establish personal participation under § 1983."  *Gallagher v. Shelton,* 587 F.3d 1063, 1069

(10th Cir. 2009).  Accordingly, even assuming that Defendants Robinson, Sauter, Wickstrom,

and Doizaki denied kites and grievances requesting the return of his religious materials, this fails

to establish the requisite personal participation for Claim Four.[9]

### 3. Defendants Emerson and Kleinheksel and Official Capacity Liability under RLUIPA

Defendants maintain that Claims Four and Five fail against Defendants Emerson and

Kleinheksel because ACDF's policy regarding one tub of property in disciplinary segregation

did not place a substantial burden on Plaintiff's ability to practice his religion and because

Plaintiff has not established that Defendants Emerson and Kleinheksel were responsible for the

loss of his prayer book.  The court agrees.

"Both the Free Exercise Clause and RLUIPA require an initial showing by Plaintiff that

Defendants have placed a substantial burden on his ability to practice his religion."  *Worthen v.*

*Oklahoma Dept. of Corrections*, No. Civ-07-687-R, 2009 WL 88555 (W.D. Okla. Jan.12, 2009)

(citing *Kay v. Bemis,* 500 F.3d 1214, 1218 (10th Cir. 2007)); 42 U.S.C. § 200cc–1(a)).  A

---

[9] This personal participation inquiry is irrelevant to Claim Five because of RLUIPA's bar on individual liability.  *Boles,* 402 F. Supp. 2d at 1240

"substantial burden exists when the state puts 'substantial pressure on an adherent to modify his behavior and violate his beliefs.'"  *Rocky Mountain Christian Church v. Bd. of Cnty. Comm'nrs of Boulder Cnty.,* 481 F. Supp. 2d 1213, 1223 (D. Colo. 2007) (quoting *Thomas v. Review Bd. of the Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981)) (further noting that RLUIPA's substantial burden test is identical to the free exercise substantial burden test).  "A substantial burden must place more than an inconvenience on religious exercise."  *Id.* (citing *Braunfeld v. Brown,* 366 U.S. 599, 605-607 (1961); *Midrash v. Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1227 (11th Cir. 2004)).

First, the court agrees that ACDF's one-tub policy did not constitute a substantial burden on Plaintiff's ability to practice his religion.  Plaintiff does not dispute that he was permitted to chose the property that would be included in the tub that remained in his cell and that he could have requested access to his additional property in order to rotate items as need.  (Knight Aff. ¶ 15.)  Plaintiff does maintain that he was "not allowed access to his legal work or religious materials, although [he] continuously requested it" (Handy Decl. ¶ 28); however, he give no specific facts to support this statement.  Thus, this unsupported assertion falls short of the specific facts necessary to establish a genuine factual issue for trial.  *Celotex*, 477 U.S. at 324; *see also Southway v. Cent. Bank of Nigeria,* 149 F. Supp. 2d 1268, 1273 (D. Colo. 2001), *aff'd,* 328 F.3d 1267 (10th Cir. 2003).  Therefore, because Plaintiff was not prevented from accessing his religious materials while in disciplinary segregation, the court finds that ACDF's one-tub policy did not place a substantial burden on Plaintiff's ability to practice his religion.  Instead it constituted a mere inconvenience on religious exercise.

48

Second, Plaintiff has failed to establish that Defendants Kleinheksel and Emerson were responsible for the loss of his prayer book.  Although Plaintiff asserts that, on July 29, 2011, he "discovered that the prayer book that [Defendants] Kleinheksel and Emerson confiscated from him on [May 25, 2011] was missing from his property" (TAC at 32, ¶ 71), Plaintiff has not proffered any evidence suggesting that Defendants Kleinheksel or Emerson—or, for that matter, any of the remaining Defendants—were responsible for the misplacement of his prayer book. Moreover, even assuming these defendants were responsible for losing his prayer book, Plaintiff has not established that it was anything more than a negligent act.  *See Gallagher v. Shelton,* 587 F.3d 1063, 1070 (10th Cir. 2009) ("an isolated act of negligence" does not violate an inmate's First Amendment right to free exercise of religion) (citations omitted); *Lovelace v. Lee,* 472 F.3d 174, 201 (4th Cir. 2006) (while RLUIPA may reach conduct that is less than intentional or purposeful, it does not reach negligent conduct); *Thomas v. Condit,* 05CV203-1-MU, 2006 WL 1642226, at *2 (W.D.N.C. June 13, 2006) (an isolated mistake does not amount to a violation of RLUIPA).

Altogether, the court finds that Plaintiff has failed to establish that Defendants Kleinheksel, Emerson, Robinson, Sauter, Wickstrom, and Doizaki violated his rights under RLUIPA or the First Amendment's Free Exercise clause.  Consistent with this conclusion, the court finds that these defendants are entitled to qualified immunity from Claims Four and Five. Therefore, the court finds that Defendants' Motion for Summary Judgment is properly granted as to Plaintiff's Claims Four and Five.

**E.      *Claim Six – Sixth Amendment Right to Self-Representation***

Plaintiff's Claim Six alleges that Defendants Robinson, Sauter, Fogg, and Cummings violated his Sixth Amendments right to self-representation by denying Plaintiff physical access to the law library while Plaintiff was proceeding *pro se* in a criminal case.  (TAC ¶¶ 94-97.) Defendants maintain that this claim is not viable because, by its terms, the Sixth Amendment applies only in criminal proceedings, and instead is more properly brought under the First Amendment's right to petition the court for redress of grievances and/or the Fourteenth Amendment's right of access to the courts.  (Mot. at 27 (citing *Ferguson v. New Mexico Corrs. Dep't,* 38 F. App'x 561, 563 (10th Cir. 2002).)

The court finds Defendants' reliance on *Ferguson* to be misplaced.  There, the Tenth Circuit rejected a inmate's Sixth Amendment self-representation claim because the inmate "raised this claim with regard to *civil litigation*."  *Ferguson,* 38 F. App'x at 563 (emphasis added).  Here, Plaintiff does not maintain that Defendants Robinson, Sauter, Fogg, and Cummings denied or impeded his ability to proceed *pro se* in a civil action; instead, he asserts that they impeded his ability to proceed *pro se* in a criminal case.  Although the Tenth Circuit has not explicitly upheld the viability of a § 1983 claim alleging a violation of the Sixth Amendment's right to self-representation based on a failure to provide adequate access to a prison law library, other circuits have.  *See, e.g., Degrate v. Godwin,* 84 F.3d 768, 769 (5th Cir. 1996); *Taylor v. List,* 880 F.2d 1040, 1047 (9th Cir. 1989).

Nevertheless, in light of *Kane v. Garcia Espitia,* 546 U.S. 9, 10 (2005), the court finds that Defendants Robinson, Sauter, Fogg, and Cummings are entitled to qualified immunity from

50

this claim.  In *Kane,* the Court considered a *habeas corpus* petitioner's claim that his Sixth

Amendment right to self-representation was denied because he received no law library access

while in jail prior to his trial.  *Id.* at 9.  The court acknowledged that "[t]he federal appellate

courts have split on whether *Faretta* [*v. California,* 422 U.S. 806 (1975)], which establishes a

Sixth Amendment right to self-representation, implies a right of the *pro se* defendant to have

access to a law library."  *Id.* (*comparing Milton v. Morris,* 767 F.2d 1443, 1446 (9th Cir. 1985)

*with United States v. Smith*, 907 F.2d 42, 45 (6th Cir. 1990)).  However, the court rejected that

such a right to law library access was "clearly establish[ed]," as required for federal *habeas*

*corpus* relief, because "*Faretta* says nothing about any specific legal aid that the State owes a

*pro se* criminal defendant."  *Id.*

     As discussed above, to overcome Defendants' assertion of qualified immunity, Plaintiff

must not only show that Defendants Robinson, Sauter, Fogg, and Cummings violated his Sixth

Amendment right to self-representation, but must also demonstrate that the right was clearly

established at the time of the violation.  Since *Kane* was decided, neither the Supreme Court nor

the Tenth Circuit has recognized that the Sixth Amendment right to self-representation includes

an implied right of a *pro se* defendant to have access to a law library.  *Klen v. City of Loveland,*

*Co.,* 661 F.3d 498, 511 (10th Cir. 2011) (In order for a right to be clearly established, "there

must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of

authority from other courts must have found the law to be as the plaintiff maintains."); *see also*

*Kane,* 546 U.S. 9 (noting that the federal appellate courts are split as to whether the Sixth

Amendment right to self-representation encompasses a right to law library access).  Therefore,

because there is no clearly established right to law library access under the Sixth Amendment,

Defendants Robinson, Suater, Fogg, and Cummings are entitled to qualified immunity from

Claim Six.  Accordingly, the court finds that Defendants' Motion is properly granted as to

Plaintiff's Claim Six.

### F.      *Claim Eight – Due Process*

Plaintiff's Claim Eight asserts that Defendants actions allegedly taken to retaliate against

Plaintiff for filing grievances and lawsuits amounted to punishment in violation of Plaintiff's

Fourteenth Amendment due process rights.  (TAC at 39, ¶¶ 101-104.)  The court finds that, to

the extent that this claim is not merely duplicative of Claims One and Three, it nevertheless must

fail.

Pretrial detainees, by the very nature of their status, "may not be punished prior to an

adjudication of guilt in accordance with due process of law. " *Bell v. Wolfish,* 441 U.S. 520, 535

(1979).  "In determining whether particular restrictions and conditions accompanying pretrial

detention amount to punishment," the court "must decide whether the disability is imposed for

the purpose of punishment or whether it is but an incident of some other legitimate governmental

purpose."  *Id.* at 538.

Here, Plaintiff's sole argument that Defendants' acts amounted to "punishment" is the

fact that these actions were allegedly taken in order to retaliate against Plaintiff for filing

grievances and lawsuits.  (TAC ¶ 103; *see also* Resp. at 35-36.)  However, the court has found

that Defendants did not retaliate against Plaintiff for exercising his constitutional rights.  Plaintiff

has not otherwise argued that Defendants' actions were taken without a legitimate government

purpose and, in most instances, Defendants have proffered such a purpose or the purpose is self-evident. *Bell,* 441 U.S. at 538.  As such, the court finds that Plaintiff has failed to establish that Defendants violated his due process rights and, therefore, Defendants are entitled to qualified immunity from Claim Eight.  Accordingly, the court finds that Defendants' Motion is properly granted as to Claim Eight.

### G.      Claim Nine – Equal Protection

Plaintiff's Claim Nine alleges that Defendants violated his right to equal protection under the Fourteenth Amendment because "[t]he level of disparity of treatment, leveled at the plaintiff, by the defendants, is different than others similarly situated."  (TAC at 40, ¶ 105.)  Defendants argue that Plaintiff has failed to establish any facts to support his claim that his rights to equal protection were violated.  (Mot. at 32-33.)

In his Response, Plaintiff attempts to refine Claim Nine by asserting that "because he is Muslim, his religious materials were confiscated upon being placed in the disciplinary segregation housing unit while other inmates similarly situated, Christians, Jews, etc. was [sic] allowed their religious materials."  (Resp. at 36.)  To establish an equal protection violation, an inmate must show that "he was singled out for [punishment] while others similarly situated were not." *United States v. Johnson,* 765 F. Supp. 658, 660 (D. Colo. 1991).  Additionally, an inmate must prove that a discriminatory intent or purpose was a motivating factor in the decision of prison officials. *See Copeland v. Machulis,* 57 F.3d 476, 480 (6th Cir. 1995) (citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 256-66 (1977); *see also Pfenninger v. Exempla, Inc.,* 116 F. Supp. 2d 1184, 1197 (D. Colo. 2000).

Plaintiff has not submitted any evidence to support his assertion that other non-Muslim inmates were permitted to have their religious materials in disciplinary segregation in excess of the one "tub" of other material the inmate chose to keep in his cell.  In fact, as discussed above, Plaintiff has not demonstrated that *he* was not permitted to have his religious materials—instead, the facts demonstrate that although he was permitted to have only one tub of property while in disciplinary segregation, he chose not to include his religious materials in that tub and also did not request to rotate the items he had in his cell with his remaining property.  (*See* Mot. at 13, ¶ 48; Resp. 13, ¶ 48.)  Furthermore, Plaintiff has not set forth any evidence suggesting that Defendants "deprived" him of his religious material because he is a Muslim.  (*See* TAC at 40, ¶¶ 105-06; Resp. at 36.)

Plaintiff also maintains that he has set forth sufficient facts to support an Equal Protection violation based on a "Class of One" theory.  (Resp. at 36.)  However, again, Plaintiff "must show he . . . (as opposed to a class in which he is a member) was 'intentionally treated differently from others similarly situated.'"  *SECSYS, LLC v. Vigil,* 666 F.3d 678, 688 (10th Cir. 2012) (quoting *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000)); *see also Jennings v. City of Stillwater,* 383 F.3d 1199, 1213 (10th Cir. 2004) (noting that this element is especially important in class of one cases).  As already discussed, Plaintiff has failed proffer any evidence proving that he was similarly situated in all material respects to other inmates at ACDF, nor has he demonstrated that he was intentionally treated differently from those other inmates.  (*See* TAC at 40, ¶¶ 105-06; Resp. at 36.)  *See also Jicarilla Apache Nation v. Rio Arriba Cnty.,* 440 F.3d

1202, 1213 (10th Cir. 2006) (noting that "courts have imposed exacting burdens on plaintiffs to demonstrate similarity in class-of-one cases.")

Altogether, whether premised on his status as a Muslim or on a class-of-one theory, the court finds that Plaintiff has failed to demonstrate a violation of his Equal Protection rights. Therefore, Defendants are entitled to qualified immunity from Claim Six. Accordingly, the court finds Defendants' Motion for Summary Judgment is properly granted as to Claim Six.

**H.      Claim Eleven – § 1983 Conspiracy**

Plaintiff's Claim Eleven asserts that Defendants conspired against Plaintiff in violation of his rights under § 1983. (TAC ¶ 109-110.) Defendants maintain that they are entitled to summary judgment on this claim because Plaintiff has failed to point to any specific facts supporting the existence of a conspiracy.

Allegations of conspiracy may form the basis of a § 1983 claim. *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998); *Snell v. Tunnell,* 920 F. 2d 673, 701 (10th Cir. 1990). A § 1983 conspiracy requires a plaintiff to demonstrate that the alleged conspirators had a meeting of the minds and engaged in concerted action to violate the plaintiff's constitutional rights. *Gallegos v. City & Cnty. of Denver,* 984 F.2d 384, 364 (10th Cir. 1993). In addition to proving a conspiracy, a plaintiff must also prove "an actual deprivation of rights; . . . proof of one without the other will be insufficient." *Snell,* 920 F.2d at 701.

Here, Plaintiff has failed to point to any specific facts in the record demonstrating that Defendants had a meeting of the minds and engaged in concerted action with the objective of violating his constitutional rights. (*See* Resp. at 36-38.) More importantly, the court has

concluded that Plaintiff has not established that his constitutional rights were violated; as a consequence, his conspiracy claim fails as a matter of law. *Snell,* 920 F.2d at 701; *see also Crosby v. Heil,* 10-cv-00951-WJM-MEH, 2012 WL 850597, at *7 (D. Colo. Mar. 12, 2012). Therefore, the court finds that Defendants are entitled to qualified immunity from Plaintiff's Claim Eleven and that Defendants' Motion for Summary Judgment is properly granted as to the same.

### I.        *Claim Twelve and Official Capacity Claims*

Plaintiff's Claim Twelve asserts a § 1983 municipal liability claim against the Arapahoe County Sheriff's Department.[10]  (TAC at 42-47, ¶¶ 111-131.)  In addition, Plaintiff's Third Amended Complaint names a large number of the individual-defendant employees of Arapahoe County Sheriff's Department in their official capacities.  These official capacity claims against the individual defendants are effectively identical to Claim Twelve.  *Pietroski v. Town of Dibble,* 134 F.3d 1006, 1009 (10th Cir. 1998) (citing *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985)).  Defendants maintain that they are entitled to summary judgment with respect to Plaintiff's official capacity claims, and that the Arapahoe County Sheriff's Department is entitled to summary judgment from Claim Twelve, because Plaintiff has failed to identify any action taken pursuant to an official policy that caused a violation of his constitutional rights. (Mot. at 17-18; 35-36.) The court agrees.

---

[10] Claim Twelve also asserts a municipal liability claim against the County of Arapahoe. (TAC ¶ 112.)  However, the County of Arapahoe was dismissed as a defendant on September 26, 2012.  (*See* Doc. No. 182.)

56

Municipal entities may be held liable under § 1983 only when a constitutional deprivation is inflicted pursuant to a government's policy or custom. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978). The plaintiff must be able to demonstrate that the "municipality was the 'moving force' behind the injury alleged." *Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). However, a municipality cannot be liable under § 1983 without a predicate constitutional harm inflicted by an officer. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *see also Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 (10th Cir. 2002) ("We will not hold a municipality liable [for constitutional violations] when there was no underlying constitutional violation by any of its officers").

As outlined above, even viewing the facts in a light most favorable to Plaintiff, the court has found that Plaintiff has not established facts demonstrating that the individual defendants violated his constitutional rights.  As such, without this predicate constitutional harm, Plaintiff's municipal liability claims must fail.  Accordingly, the court finds that Defendants' Motion is properly granted, and that summary judgment is properly entered in favor of the Arapahoe County Sheriff's Department as to Claim Twelve, and in favor of Defendants as to Plaintiff's official capacity claims.

### J.      State Law Claims

Plaintiff's remaining claims—Claims Fifteen through Twenty-One—allege violations of state law.  (*See* TAC at 49-52, ¶¶ 136–153.)  The pretrial dismissal of all federal claims—leaving only state-law claims—"generally prevents a district court from reviewing the merits of the state

law claim[s]." *McWilliams v. Jefferson Cnty.*, 463 F.3d 1113, 1117 (10th Cir. 2006); *see also* 28 U.S.C. § 1367(c)(3) (stating that a district court may decline to exercise supplemental jurisdiction over state-law claims if "the district has dismissed all claims over which it has original jurisdiction").  This is not an inflexible rule, however, and a district court has discretion to adjudicate the merits of the state-law claims when "the values of judicial economy, convenience, fairness, and comity" indicate that retaining jurisdiction over the state-law claims would be appropriate. *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 349–50 (1988).  Nevertheless, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Cohill*, 484 U.S. at 350 n.7; *see also Thatcher Enters. v. Cache Cnty. Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990) ( "Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.").

Here, because all of Plaintiff's federal claims have been eliminated, the court finds it proper for the District Court to decline to exercise jurisdiction over Plaintiff's state law claims.

WHEREFORE, for the foregoing reasons, the court respectfully

RECOMMENDS that the "Motion for Summary Judgment of All Defendants Except County of Arapahoe to Plaintiff's Third Amended Complaint"  (Doc. No. 136) be GRANTED, and that summary judgment be entered in favor of all remaining Defendants.

The court further

RECOMMENDS that the District Court certify, pursuant to 28 U.S.C. § 1915(a)(3), that

any appeal from this recommendation would not be taken in good faith and therefore *in forma pauperis* status will be denied for the purpose of appeal.  *See Coppedge v. United States*, 369 U.S. 438 (1962).  Thereafter, if Plaintiff files a notice of appeal he also must pay the full $455.00 appellate filing fee or file a motion to proceed *in forma pauperis* in the United States Court of Appeals for the Tenth Circuit within thirty days of the court's final order in accordance with Fed. R. App. P. 24.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review."  *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection

does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 27th day of November, 2012.

BY THE COURT:

Kathleen M Tafoya
United States Magistrate Judge